Good morning. May it please the Court, Erica Bailey Drake here today on behalf of Bruce Albertson, Jr., plaintiff appellant. I'd like to reserve two minutes for rebuttal if I may. Sure. Thank you. Mr. Albertson has what could best be classified as a procedurally intricate Title II case. As a result, we're seeking remedies in the alternative. When Mr. Albertson filed his original application for benefits back in 2009, he had an alleged onset date of January 1, 2009. In addition to some other physical and mental impairments, his headaches were at the front and center of that particular application. His headaches were so severe and debilitating, he had them pretty much on a daily basis. When he had them, they lasted for two to four hours. And he went to great lengths to seek treatment for those headaches. What was the major error the ALJ made? There are actually two, Your Honor. The first primary error that the underlying ALJ made... You mean number one? ALJ number one? Okay. ...was based upon the analysis of the medical evidence. There was a psychological examining physician who examined Mr. Albertson and indicated that, in fact, he did have severe mental impairments. And those severe mental impairments were depression and anxiety. Based on her opinion, they were directly interrelated to the severe and debilitating headaches he was suffering from. She also gave him essentially three severe limitations in the workplace. She indicated, and I quote, And what did the ALJ do with that testimony? The ALJ said, with respect to that particular opinion, he was going to discredit it based on a non-examining psychiatric opinion. That non-examining psychiatric opinion was basically that Mr. Albertson had no severe mental impairment and, as a result, would have no limitations stemming from any mental impairment in the workplace. Why isn't the ALJ within his rights to say, I find this opinion more credible than that opinion? Well, when we analyze medical opinion evidence, typically treating opinions are given the greatest deference, particularly if they're uncontroverted. Examining physicians are typically given next deference, and then the lowest on that hierarchy would be a non-examining physician. Well, you know, there was more than just I decide I like somebody else better. The first ALJ said there were no objective findings to explain those subjective complaints, no history of psychiatric hospitalization or long-term mental health treatment, anti-anxiety medication works. I'm paraphrasing, but there are a number of additional, and I could go on, including his daily activities being inconsistent with both the mental and physical limitations claimed. So why isn't that sufficient? With respect to no objective medical evidence of a psychiatric impairment, in fact, Dr. Sherrill's report was based upon her own observations of Mr. Albertson during that particular examination. She did do some psychological testing of him on that particular date, and in addition he was prescribed medication for anxiety on an ongoing basis. Right, which worked well, controlled the symptoms, and then the ALJ goes on at some length to describe why the daily activities are inconsistent, including on psychological grounds where, you know, there's a report of good relationships. I'm paraphrasing, obviously, but there's two or three paragraphs of pretty intense explanation, and I know that your client has a different view of it, but we're just reviewing for substantial evidence. One other way that the ALJ erred was with respect to Mr. Albertson's subjective symptoms of his headaches. The ALJ really did not look at Mr. Albertson's headaches in terms of their frequency and duration, which are really at the hallmark of any individual who suffers from headaches. He had reported the frequency and duration of headaches pretty consistently to every single neurologist that he saw, and he saw eight, to neurosurgeons that he also treated with, and that's the other way. The second major way that the ALJ's decision fails is within the residual function capacity of Mr. Albertson. He found him capable of light work. That's the only limitation. He did not take into account whether or not his headaches would have impeded his ability to engage in a regular work attendance. Do I understand correctly that he had gone for a second or third or fourth opinion to Mayo Clinic? That's correct. And the ALJ made no reference to that visit or their findings? That is correct, Your Honor. And, in fact, while he was at the Mayo Clinic and he went in the dead of winter, which is something for those of us who live in Southern California to endure, he treated with not only a neurologist but also an otorhinolaryngologist. Easy for you to say. And those findings were actually not only were they ignored by the first ALJ, once this case went up to the central district, the magistrate basically indicated that she was going to discredit what one of the doctors, Dr. Daliwale, who is the otorhinolaryngologist, said. He never questioned the existence of Mr. Albertson's headaches, rather questioned what the causation was of Mr. Albertson's headaches. Well, I don't read the ALJ as questioning their existence either, because one of the findings is that after neurologists, in the plural, recommended tapering off pain medication as a way to decrease headaches, that seemed to help. So he's not questioning their existence. He's saying I'm looking at his daily activities and I'm looking at these other factors to determine that they're not interfering with his ability to work. If reasonable minds could differ, don't we have to defer to that? When Judge Wojcicki, the first ALJ, relied on Mr. Albertson's activities of daily living, he did not make the leap that an ALJ must make between how those activities of daily living would actually translate over into work activities on a regular basis. In fact, he cited to the fact that Mr. Albertson attended IEPs of one of his disabled children. Well, IEPs are quarterly, and sometimes bi-yearly. They're but once every few months. Mr. Albertson's testimony was, in fact, that his activities of daily living were quite limited by his headaches. Now, fast forward. Once Mr. Albertson's original case was here at the Court of Appeals, he had a hearing in front of a second administrative law judge. That was a fact that we disclosed in our mediation statement. And once he had that hearing, the second ALJ adjudicated him to be disabled. That ALJ, ALJ number two, did something different from the first ALJ. During the first administrative law judge hearing, Mr. Albertson's administrative counsel implored of that ALJ, would you please consult with a medical expert? There has been no medical consultant who has looked at this medical record in its entirety. ALJ number one declined to do that. ALJ number two, however, looked at the record and said, there's something here, but I'm not exactly sure what it is. I need to have a medical expert come in and help me flesh this out. When ALJ Lischner did that, a medical expert appeared and testified. That's Dr. Lynn Jahnke. And essentially, she stated that the severity of Mr. Albertson's headaches was very well documented in his medical records. And in fact, not only was it well documented, but she said, and I quote, I believe these are really great medical records. He's seen the doctor often. He's tried many different techniques. He's been very compliant. His pain is unusual. It's not a classic nerve pain. It's almost like a nerve pain kind of in his forehead. You know, it's quite different from a migraine, but quite severe. As a result of her review of the medical evidence, she indicated that the occipital nerve blocks had been unsuccessful. She believed the records established that he had headaches four times per week, even after he had had the medication taper. Prior to having the medication taper down, he had actually had the headaches on a daily basis, she stated. And she also used the opinion of Dr. Endocrinologist, Dr. Moghisi, whom the first ALJ used to discredit Mr. Albertson. The second ALJ used part of that opinion to say that that provided a part of her opinion with respect to his work-related limitations. Let me ask you a question. It's not unusual. I should say unusual. It's not unheard of. You have two proceedings, and the second one comes out differently. You kind of go to school on the first one. You figure out what you did wrong the first time, and you make a better showing the second time. Isn't it possible to have two ALJs, hear a case involving the same guy, different presentations, though, and come to different conclusions? It might be. But if that occurs, and in a case like this one, there's a reasonable possibility that what happened in that second case would alter what happened in the first, then we have a sentencing situation. But if they are consistent, they can be permitted to stand. And there was at least one place in the record, and now I'm forgetting where, where there was a finding that the headaches became worse over time. And that's actually fairly typical in the cases I've seen where there's an initial denial and a new hearing for a new period of time with a granting of benefits. And the most common thread is, well, things got worse. And am I misremembering? Isn't there some evidence to that effect? There are cases like that. In this case, there was at least one statement. Now, in this case, the headaches did not worsen. In fact, the headaches improved. They improved as of February 2011 from every day to four times per week. So, in fact, after the medication tapered, after that original period of time from his underlying claim, his headaches improved. They were worse before. But even with the improvement, they were so severe that they would have kept him from being employed on a full-time basis, according to ALJ Lishner's decision. The way that the magistrate ultimately reconciled the two cases. I thought his testimony was that he had really bad headaches twice a week, not every day. In the second hearing, his testimony was that he had really bad headaches twice per week. And that was what formed the basis, ultimately, of ALJ Lishner's residual functional capacity assessment. Her residual functional capacity assessment differed from Judge Wojciechowski's in that she limited him to light work, 20 pounds frequently, 10 pounds occasionally. He could sit and stand six out of eight hours for both, no ladders or heights, no concentrated exposure to smoke, dust, gases, and he would miss work two times per week due to his headaches. And as her basis, she indicated that she was not only crediting Mr. Albertson's testimony, she was crediting the testimony of the vocational expert, the medical expert, the medical records, as well as his medications taken, which was also something not taken into account by Judge Wojciechowski in the first proceeding. So you're down to two minutes. Let me see if there are any other questions now and if not. Thank you. Thank you very much, Ms. Drake. Good morning, Your Honors. Elizabeth Fair on behalf of the Acting Commissioner of Social Security, Carolyn Colvin. I would like to start first with ALJ Lishner's decision and the reconciliation of the two applications. Because the district court did address this issue, it's an abuse of the discretion standard now, which means this court, in order to find remand under sentence six, would have to find that Judge Rosenbluth's findings on that issue were so far beyond the pale of reasonable justification under the circumstances. You can't find that here. Judge Rosenbluth looked at both decisions and she said that the first ALJ found the claimant was not credible. The claimant has not challenged credibility before this court. That's simply not. She has not done that. So with the second ALJ found the claimant credible, and you can see that because in her decision on the second hearing, she specifically says on page 690 of the SER, the rationale for the decision is the testimony of the claimant from the prior hearing, as well as this one, the vocational expert and the medical expert. So that's three different bases for her finding that this claimant was disabled. And the first one is the claimant's testimony at the May 2013 hearing, where he clearly testified that his conditions had worsened. He added a cardiac condition. He specifically said that got worse in May 2011. He said his diabetes became insulin dependent in January 2011, which is the same month that our ALJ issued the decision, ALJ Wachowski. So those are bases. And then you have this medical expert who looked at the same evidence and had a difference of opinion, but the fact that the claimant's explained his headaches the same way since 2007 actually counts against him. If you look in the record at page 146, in 2008 he made the most money he's ever made, over $82,000. If his headaches are, quote-unquote, debilitating, excruciating, how could he have earned that kind of money in 2008 after they started? If they've been the same this whole time, then all we have is a difference of opinion. And there's no authority that says two ALJs have to come to the same credibility analysis. It hasn't been challenged here, and it's not an abuse of discretion for Judge Rosenbluth to have found that under Bruton reconciles the two applications. Go ahead, Judge. Is this true? Part of the finding of, I'll say, ALJ number two depended upon a different credibility finding from ALJ number one. Yes. But that difference alone, in your view, Commissioner's view, is not sufficient to make these two decisions irreconcilable? Yes, if I understand your question. That makes them reconcilable. Because what? Because one maybe justifiably chose to find the claimant not credible, and the other found the claimant credible? Yes. And if you look at the first ALJ's credibility analysis, which, again, has not been challenged, as Judge Graber pointed out, it talks about his daily activities. No one's questioning the fact that this man has headaches. What the first ALJ found was that they weren't debilitating, and he said they did limit him to light work. And the ME, Dr. Klein, specifically said, because of his headaches, he's limited to light work. That's a reasonable, substantial evidence basis for the first ALJ to have concluded the way he did. When you were talking about the credibility finding, we're talking about his personal credibility. Correct. What about Ms. Drake's point that ALJ number one discounted the doctors improperly and, in particular, failed to even mention the Mayo Clinic visit and diagnosis? Well, that's not true at all. On page 21, he refers to the Mayo Clinic records, and the district court points that out. That exhibits 5F and 9F, which is where the Mayo Clinic records are. I've got ALJ number. Which page? Page 21 on the first ALJ's decision. Are you referring to the ER number? Yes. I'm sorry. There's so many records here. It's page three of the opinion of the decision, but it's page 21 of the record. Correct. Page 21? You mean under the findings? He talks about the ‑‑ No, no. Where on the page is it? The bottom paragraph. The bottom paragraph, right. He's speaking of ‑‑ Hang on a second. I'm trying to find it. I don't see it. Which of these exhibits is the Mayo Clinic records? Well, it's in 2. It's in 5F. Let me tell you where in 5F. When he cites these MRIs and so forth and the exhibit numbers, he's referring to Mayo Clinic records? He's referring to what happened at the Mayo Clinic, yes. Can you read me the sentence you're referring to? I'm sorry. I don't see it. The claimant reports a history of mass on the right side of his forehead. In October 2007, he noticed a swelling. Then he's citing 5F. He's talking about the frontal vascular malformation. Right. All of these things are what ‑‑ Where does it say he went to the Mayo Clinic and they offered a new ‑‑ It doesn't say that. Let me point out. Not only does he say it, but he doesn't mention the visit. He doesn't mention there was a new diagnosis. They diagnosed him with what? New persistent daily headaches. I don't see that in here. That's true. But it's at the hearing. The ALJ is aware of it. As the district court pointed out, there's really no ‑‑ Well, I don't know if he's aware of it. It was mentioned, but I don't know if it ‑‑ It was mentioned a couple of times at the first hearing. I don't see where it registered. Okay. Well, there's really not ‑‑ For the purposes of what the ALJ is doing here, whether or not he had this diagnosis versus that diagnosis, he's aware of the fact that this claimant is complaining about debilitating headaches from October 2007, yet he worked all through 2008. How do we know that had the ALJ taken the Mayo Clinic new diagnosis into account, it wouldn't have changed his assessment of the other doctors? Okay. Well, that's a good question. Because if you look at what happened at the Mayo Clinic, first of all, it wasn't treatment. He went there for a second opinion. That's not treatment. He went there. He had diagnostic tests, not treatment. If you look at those records, there is not a single reference in there to work‑related limitations. The doctors repeat what claimant says, that he's been on disability, but he doesn't say when he's been on disability. And as we note, he worked, he made over $82,000 during the time he's had these exact same headaches. So the Mayo Clinic doesn't change anything. What happened there was he got a different diagnosis. It doesn't change anything about what he was complaining of. It doesn't contain any work‑related limitations. It doesn't even talk about what he's actually doing. An ALJ, number one, did find that chronic headaches were a severe impairment. Exactly. And based on ‑‑ oh, I'm sorry. So then the question is how severe? That's a good argument you're making, but the question is, you know, I mean, is that the thought process the ALJ went through? For all we know, ALJ didn't even, you know, consider it, right? Just laid it aside. Well, I don't think that's true, and I don't ‑‑ What in the record shows that that's not true? Well, the ALJ refers to the exhibits that the Mayo Clinic evidence is in, and claimants treating Dr. Whalen looked at the Mayo Clinic evidence, summarized it. The ALJ is aware of that exhibit. He's looking at it. And, again, there's nothing in the Mayo Clinic evidence. What was the date of the Mayo Clinic visit? It was 2006? January 2010. Okay. He said he was there for 10 days. The records ‑‑ there's specific evidence from January 5th and January 7th. And, really, let me tell you exactly where in Exhibit 5 that is. That's okay. It's 476 to 87 in Exhibit 5F, and in 9F, it's 616 to 28. Supposedly we were to conclude, for whatever reason, that the first ALJ misassessed the residual functional capacity. I'm not talking about his credibility, but because of the way he weighed the doctors. What's the remedy here? And I'm not going to concede that. But the remedy would be to, I guess, remand it for further proceedings, if you feel that way. But let me reiterate that there is nothing in the records from the Mayo Clinic, there's nothing in the UCLA experts, there's nothing in all of claimants' massive treatment history that says anything about work‑related limitations. Dr. Klein did that. Dr. Klein found light work. And as far as Dr. Sherrill goes, Dr. Brooks ‑‑ Yeah, back to my question. You would be for further proceedings? Well, there's nothing you could credit here to warrant disability. Who would it go back to, number two or number one? Well, number one is the only decision that's on appeal. There's no way you could send it back to ALJ Lischner. No one appealed that decision. And also, let me point out that in ALJ Lischner's decision, that application, claimant expressed the ask for benefits as of January 1, 2011. He specifically said, I'm not asking for any other benefits in that application. And that is on pages 726 to 27 and on page ‑‑ or I'm sorry, page 851 and 865 of the second writing. It would be sent back to the first guy with either directions to reconsider in some fashion or just award benefits. Those are the options we would have. Well, there's no reason to award benefits. Well, I'm not asking you if you agree with that. I'm asking you what the options are. But I don't see how you could do that under this course law because there is nothing in the record before ALJ Wachowski that is consistent with disability. There is no medical opinion in there that's consistent with disability. So you couldn't do that. So part of this record is that this claimant has been complaining of these absolutely debilitating conditions, headaches, for a very long period of time. They clearly weren't for all of 2008. And with the second application, he clearly said things got worse. His kidney problems got worse. Well, according to the first ALJ, he testified that way too, as I understand it. He says the claimant testified his frequent headaches are becoming more severe. So it sounds like that was in the first hearing as well. Well, there's evidence in the record, as you pointed out before, that after he came back from the Mayo Clinic in February 2010, he's taking Elevil, and he says his headaches improved. And I would also like to point out that in spite of his allegations that his headaches were exactly the same since 2007, in 2008, Dr. Williams specifically said he doesn't have any headaches and he doesn't have any skull pain, and that is on page 460 of the original record. So it's not exactly true that he's been saying these same things for the whole point, but at the same time, he earned $82,000 while he's had the same conditions. And there is, based on what claimant actually argued about the first ALJ's decision, the ALJ properly discredited the consultative psych CE, Dr. Sherrill, and there is no evidence in the Mayo Clinic records or from Dr. Whalen, the longtime treating physician, that says anything about work-related limitations. That came from Dr. Klein. The ALJ gave significant weight to Dr. Klein. Light work. Do you have any more questions? No. No further questions. Thank you very much. Thank you. Ms. Drake? We've got about two minutes and change left. Yes, thank you. I'd like to address a couple of the things that the commissioner stated with respect to Mr. Albertson. His alleged onset date in the underlying case, case number 1, was January 1, 2009. He did have the onset of the headaches in October 2007. That is correct. They came on suddenly. He did continue to work through 2008. However, he worked for a family business where he was allowed to take breaks if he needed to. He was on his medication. He testified that he was making mistakes, and ultimately, at the end of 2008, he couldn't take it anymore, and so he stopped working, effective 2009. With respect to his alleged onset date in the second claim, there was a jurisdictional barrier. He couldn't allege a disability onset date prior to the first unfavorable ALJ decision. With respect to Dr. Johnkey's testimony in the second hearing, she provided a retrospective medical opinion where there was overlapping medical evidence from both periods of time. She indicated that those limitations would have been in place as early as 2009. What basis would we have to remand for benefits as opposed to reconsideration? With respect to remanding for benefits, that would be on the basis of the underlying appeal, and that would mean that we would credit Dr. Sherrill's opinion with respect to Mr. Albertson's work-related limitations, which were severe, and also the testimony from the vocational expert, which was based upon the fact that Mr. Albertson would miss work three times or more per month due to his headache limitations. From our perspective, using the three-step approach that was articulated in Garrison and then again in Treichler and Burrell, there can be no serious doubt that Mr. Albertson is disabled. He's been adjudicated disabled by the commissioner now. That retrospective medical opinion from Dr. Johnkey indicates that he would have been disabled back to 2009. That can be used with respect to serious doubt. Under the serious doubt standard, we can look at the record as a whole, and that would include the second administrative record. What is the period of the first disability from when to when? The period of the first disability is January 1, 2009, through January 28, 2011. In the event that the case is remanded as opposed to awarded benefits, we would respectfully request that it be limited to that scope of time undergone. Just so we have some real-life understanding of this, how much money is involved in that period of time? Mr. Albertson's PIA is in the range of $1,630 per month, and for a younger individual who may never work again for two years' time, that is significant to him. So we're talking approximately $25,000 in controversy? Correct. Okay. Any other questions? Thank you very much to both counsel. The case just argued is submitted. We'll stand and recess for 10 minutes.
judges: Tashima, Silverman, Graber